IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **06-cv-02284-JLK**

**DOUGLAS R. OBERHAMER,**

Plaintiff,

v.

**DEEP ROCK WATER CO., a Delaware corporation, and
MILE-HI DEEP ROCK HOLDINGS, LLC, a Delaware corporation**

Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Kane, J.

This business employment dispute arose after Plaintiff Douglas Oberhamer was

terminated from his executive position with Defendant Deep Rock Water Co. ("Deep Rock").

Invoking various provisions of the parties' employment and noncompete agreements, Deep Rock

called in and repurchased stock Oberhamer contends he had been pressured to purchase at a

significant loss to Oberhamer, and avoided obligations to pay him severance. Oberhamer sued,

asserting claims for breach of contract, bad faith and promissory estoppel, as well as various tort-

based claims for compensatory and exemplary damages.

The matter is before me on Defendants' Motion for Summary Judgment. I GRANT the

Motion in Part and DENY it in part.

## **Facts**

The following facts are undisputed unless otherwise indicated.

1

Deep Rock is a Colorado general partnership engaged in bottling and selling artesian, filtered, and distilled water in several states.  The Fie family owned Deep Rock until 2004.  Of his 37 years in the distilled and bottled water industry, Oberhamer spent 18 with Deep Rock.  During the Fie family's tenure, Oberhamer served first as Deep Rock's Vice President and General Manager and later as Executive Vice President and Chief Operation Officer.

In 2004 the Fie family sold Deep Rock to the investor group Mile-Hi DR Acquisitions, LLC.  Deep Rock then became a subsidiary of Mile-Hi Deep Rock Holdings, LLC ("Mile-Hi").[1]  At the time of sale, the Mile-Hi Board of Managers offered Oberhamer employment as President of Deep Rock effective September 21, 2004.  *See generally* Defs.' Ex. C, Offer Letter.  Oberhamer accepted the offer understanding his employment would be "at-will."  *Id.*  While the move appeared to be a promotion, the offer called for Oberhamer's annual salary to be reduced from $220,000 to $200,000.  As an additional benefit, however, the offer provieded Oberhamer would "be eligible to participate in the company's performance bonus and stock options plans, which we will design after the contemplated acquisition takes place."  *Id.*

As a condition of his employment, Oberhamer entered into a Non-Competition, Confidentiality and Trade Secret Agreement ("Agreement") with Mile-Hi.  Defs.' Exhibit E; Agreement.  The Agreement included the following severance provision:

> 2.  **Severance/Option to Extend Agreement.**  Oberhamer acknowledges that he is not entitled to any severance from the Company upon termination of employment if said termination is a result of Oberhamer's voluntary decision to leave the Company or if Company terminates Oberhamer's employment for cause, and that the nonpayment of severance under either of these circumstances does not alleviate his duties and obligations under this Agreement.

---

[1]  Mile-Hi is effectively the same entity as Deep Rock, managed by the same Board of Managers, and will be referred to by both names, or, collectively as "Deep Rock."

2

Oberhamer will only be entitled to severance from Company if Company terminates his employment without cause, and said severance shall be limited to an amount equivalent to one year's salary, at the annual salary rate Oberhamer is earning at the time of his termination of employment...

(a)     Examples of Cause shall include, but not be limited to:

... (9) other grounds that the Company reasonably determines constitutes [sic] Cause based on a consideration of its Business interests.

*Id.* at 5.

Oberhamer also contends the Board of Managers pressured him to make a personal investment in Deep Rock.  Pl.'s Ex. 1, Oberhamer Aff. ¶9.  Specifically, Oberhamer contends Board of Managers member John Thomson "insisted that I 'put skin in the game,'" which Thomson described as meaning investing in Deep Rock through the purchase of Deep Rock stock or membership units.  *Id.*  While no one expressly told Oberhamer to invest, Oberhamer contends he understood this was a term of his continued employment.  *Id.* at ¶10.

Oberhamer invested $200,000 from his retirement fund in Deep Rock stock.   Pursuant to his investment, Oberhamer signed the September 21, 2004 Investor Rights Agreement, which gave Deep Rock the option to repurchase Oberhamer's shares at fair market value upon Oberhamer's termination.  *See* Defs.' Ex. L, Investor Rights Agreement ¶2A.2(a).  Specifically, the Investor Rights Agreement provided:

2A.2  <u>Termination of Employment</u>.  If there shall occur a Termination of Employment of an Executive for any reason (other than as a result of such Executive's death or disability), whether voluntarily or involuntarily or with or without Cause, then the Units owned by such Executive at the time of such Termination of Employment or thereafter issued upon the conversion or exercise of any Unit Equivalents held by such Executive at the time of such Termination of Employment shall be subject to the following purchase options:

(a) First, for a period commencing on the date of such Termination of Employment and ending on the 180th day following such date or, if later, the 45th

3

day after determination of the price hereunder to be paid for such Units and the determination as to whether and how many of such units can be purchased by the Company, the company shall have the right and option to purchase all or any part of such Units, at the Fair market Value thereof or, if such Termination of Employment is for Cause, then at the option of the company, at the lower of fair market Value or Original Cost.  If the Company does not exercise its option under this Section 2A.2(a) with respect to all of the Units subject to such option, then on or prior to the last day of such option period the company shall mail written notice of such non-exercise to the Equity Sponsor.

*Id.* at 10-11.

In June 2005, while Oberhamer was President, Deep Rock ran out of money.  The parties dispute whether Deep Rock's poor financial health was symptomatic of Oberhamer's poor management or the Board of Managers' decision to grow the company aggressively.  Defs.' Mot. for Summ. J. 5; Pl.'s Resp. to Mot. for Summ. J. 7.

Whatever the reason or combination of reasons, the following July Board of Managers member John Thomson told Oberhamer that Deep Rock needed a change in leadership.  Oberhamer Dep., 191:7-195:7.  Oberhamer subsequently met with an industrial psychologist to determine what position at Deep Rock best suited him.  As a result, Oberhamer accepted a demotion to Executive Vice President of Business Development, a position he himself had created.  *See* Defs.' Exhibit G, 11/15/05 Email from Oberhamer.  Oberhamer's annual salary was further reduced from $200,000 to $140,000.  Oberhamer contends Deep Rock again represented he would be eligible for stock options and participation in a bonus plan to offset the salary reduction.  Even with the salary reduction, however, Oberhamer remained the second highest paid executive at Deep Rock. .

Oberhamer began his position as Executive Vice President on December 1, 2005.  By January 4, 2006, with the company still out of money, the decision was made to terminate

4

Oberhamer.  According to Oberhamer, he was called into a meeting by then-President Bruce Lohn who relayed a message from the Deep Rock Board of Managers that "'Christmas is over; get Oberhamer out of there.'"  Oberhamer Aff., ¶30.  Oberhamer says Lohn told him he had "no future" with Deep Rock and "should begin looking for another job."  *Id.*  When Oberhamer reminded Lohn he had a severance provision in his Noncompete Agreement that called for a year's salary upon termination, Oberhamer said Lohn "appeared surprised."  *Id.* ¶ 32-33.

In a series of follow-up meetings described in his affidavit, Oberhamer and Lohn discussed their respective concerns about severance and Oberhamer's $200,000 investment and Deep Rock ultimately backed off the termination decision in favor of a potential consulting arrangement.  The motivating factors were that Deep Rock did not want to pay severance, and Oberhamer did not want Deep Rock to exercise its right to repurchase his stock at fair market value, which was essentially nothing at the time.  Affid. ¶¶ 34-38.  According to Oberhamer, the deal that developed was that, if Oberhamer agreed to accept a consulting position and waive severance, Deep Rock would not exercise its repurchase option and allow Oberhamer to hold on to his investment.  The discussions were serious, with Lohn going so far as to show Oberhamer an email communication from Deep Rock counsel in which counsel confirmed Lohn's "intention at this time . . . not to repurchase [Oberhamer's stock]."  Pl.'s Ex. 1C (Jan. 17, 2006 email from K. Oakley to B. Lohn).[2]

Oberhamer also contends Lohn made statements during these discussions that support his claim of age discrimination.  Oberhamer characterizes these statements as follows:

---

[2] Deep Rock initially withheld this document from Oberhamer as a privileged lawyer-client communication.  Plaintiff moved to compel, and I held the document was not privileged and ordered its disclosure.  *See* Minutes (Doc. 53).

> [W]hatever career I pursued after Deep Rock, it should not be a career that would require, quote, pushing people, end quote, because that's for younger people.  He said that he was older than I am, not that much older, but when we get older, we don't like to work as many hours.  And he said, not that Greg, meaning Greg Puhr, route operations VP, Craig Dodd - Craig meaning Craig Dodd, who was vice president of sales, or Tom, meaning Tom Schwein, who was chief financial officer, are that much younger but they're younger.

Oberhamer Dep. at 33:17-34:2.

On January 31, Oberhamer asked to consult counsel about the offer.  *Id.* at ¶ 45.  On February 3, Lohn terminated Oberhamer "for cause" and had security guards take Oberhamer from the building.  *Id.* at ¶ 46.

 Upon Oberhamer's termination, Deep Rock in fact exercised its option to repurchase Oberhamer's stock.  Oberhamer Aff. ¶51.  Deep Rock repurchased Oberhamer's stock, originally purchased for $200,000, at the then-fair market value price of about $9,800.  *Id.*  Deep Rock also refused Oberhamer any severance pay, invoking ¶ 2(a) of the Agreement and telling Oberhamer he had been terminated "for cause." At the time of his termination, Oberhamer had never been offered additional stock options or invited to participate in any executive bonus plan.  He was 56 years old.

Oberhamer sued Deep Rock and Mile-Hi seeking damages for: (1) federal age discrimination; (2) breach of contract based on the assertion that Deep Rock's refusal to pay him severance violated the Agreement; (3) willful and wanton breach of contract; (4) breach of the covenant of good faith and fair dealing implied in the Agreement as a matter of law; (5) promissory estoppel; (6) negligent misrepresentation; and (7) outrageous conduct based on characterizations of Deep Rock's conduct as having intentionally and recklessly caused Oberhamer severe emotional distress.  *See* Pl.'s Compl. ¶¶ 1-81.  Deep Rock moves for summary

6

judgment on all claims.

### **Summary Judgment Standard**.

Summary judgment in favor of the moving party is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When applying this standard, the court should view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party.  *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir. 1999).

The moving party has the initial burden of identifying the portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrates the absence of genuine issues for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets this burden, the burden shifts to the nonmoving party to show there are genuine issues of material fact to be determined.  *Id* at 322.  When the nonmoving party will bear the burden of proof at trial, that party may not rest upon the allegations made in the complaint, but must respond with specific facts showing the existence of a genuine and material factual issue to be tried.  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998).  A genuine issue of material fact exists if a juror could rationally decide the disputed allegations in the non-movant's favor based on the evidence presented, and the disputed fact might affect the outcome of the suit under the governing law.  *See Schwartz v. Bhd. of Maint. of Way Employees*, 264 F.3d 1181, 1183 (10th Cir. 2001).

Evidence submitted at the summary judgment stage need not be in a form that would be admissible at trial, but its content and substance must be admissible to be considered.  *Argo v.*

*Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

<u>Discussion</u>

**1.      Inadmissibility of Evidence as Offer to Compromise Under Rule 408**

I first address Defendants' objection to certain testimonial evidence being considered on summary judgment.  I overrule the objection.

Deep Rock contends Oberhamer's conversations with Lohn reference offers to compromise inadmissible under Fed. R. Evid. 408.  During these conversations, Lohn offered Oberhamer a consulting position and offered not to repurchase Oberhamer's stock if Oberhamer agreed to waive the Employment Agreement.  Deep Rock seeks to exclude these offers from consideration.  *See* Defs.' Reply in Supp. of Defs.' Mot. for Summ. J. 15.

In pertinent part, Rule 408 states:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.  Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Deep Rock's objection is inapt for several reasons.  The evidence is admissible because: (1) the offers were part of negotiations to alter or modify an employment agreement, not to compromise a claim; and (2) the offers were made before the controversy.

First, offers must be made for the purpose of compromising an actual or threatened legal claim to receive protection under Rule 408.  Offers to alter or modify a contract are not the same as offers to compromise a claim.  *See Southeast Capital Inv. Corp. v. Albermarle Hotel, Inc.,* 550 So.2d 49, 52 (Fla. App. 1989) (repudiating a contract or attempting to induce the other party to agree to substantially new terms does not constitute an offer to compromise a claim).

8

Oberhamer contends, and Deep Rock offers no evidence to dispute, that Deep Rock's offers were meant to induce Oberhamer to waive entitlement to severance in exchange for a consulting contract. Oberhamer Aff., ¶¶ 34-46. As such, the offers were attempts to alter a contractual relationship, not offers to compromise a claim within the purview of Rule 408.

Second, offers to compromise before a legal controversy arises are distinguishable from those made after. Wigmore on Evidence § 1061, n. 1. Offers made before a controversy are not protected by Rule 408. *See Ogden v. George F. Alger Co.*, 353 Mich. 402, 406 (Mich. 1958) (offer of cash to employee to give up employment contract before controversy arose held admissible). No controversy existed here until Deep Rock terminated Oberhamer "for cause" and declined to pay him severance. The disputed offers to make Oberhamer a consultant or to allow him to keep his stock without repurchasing it occurred before the termination and independently of it. Deep Rock does not make the case that its efforts were intended to avoid litigation and the facts in the record support no such inference.

Deep Rock relies on *E.E.O.C. v. Gear Petroleum, Inc.,* 948 F.2d 1542 (10th Cir. 1991) for its contention that the offers are inadmissable. Unlike the present case, the defendants in *Gear Petroleum* made their offers during E.E.O.C. administrative proceedings aimed at compromise negotiations. This factor was pivotal to the court's decision. *Id* at 1544, ("[i]n this case, the crucial inquiry involves whether the . . . letters were part of compromise negotiations between the EEOC and Gear"). As stated above, Deep Rock's offers were made in an effort to renegotiate Oberhamer's Employment Agreement, not in an effort to compromise real or threatened legal action. As a result Deep Rock is not entitled to the same protection afforded the defendants in *Gear Petroleum*.

In short, Deep Rock's offers are not the type of offers protected by Rule 408. Deep Rock's objection is OVERRULED.

**2.      Age Discrimination**.

Defendants move for summary judgment on Oberhamer's federal age discrimination claim. Despite weaknesses on the ultimate issue of discriminatory intent, Oberhamer's claim survives summary judgment.

Where a plaintiff asserts circumstantial, rather than direct evidence of unlawful discrimination, the burden shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-805 (1973) determines whether the plaintiff has raised an inference of unlawful discrimination sufficient to survive summary judgment. *Adamson v. Multicommunity Diversified Servs.*, 514 F.3d 1136, 1145 (10th Cir. 2008). The *McDonnell Douglas* test is inapplicable where the plaintiff offers direct evidence of discrimination. *Id.*

Oberhamer alleges that Lohn's comments regarding his position being a young man's game constitute direct evidence of age-based discrimination. I disagree, because the comments require an additional inference to prove the termination decision was discriminatorily motivated. As circumstantial evidence for the necessary inference, they require analysis under the *McDonnell Douglas* burden-shifting paradigm. *Adamson* 514 F.3d at 1145. *See Ramsey v. City and County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990) (supervisor's statements that women were better suited for certain positions were not direct evidence that the employment decision at issue was discriminatorily motivated).

Under *McDonnell Douglas*, plaintiff must first present sufficient evidence to carry a *prima facie* case of discrimination. *Adamson* at 1145. In order to establish a *prima facie* case of

age discrimination, plaintiff must show: (1) he was within the age group protected by the ADEA; (2) was performing his job satisfactorily; (3) was terminated; and (4) was replaced by a younger person. *Id* at 1146.

If plaintiff meets his initial burden, the burden shifts to the defendant to proffer a facially legitimate, nondiscriminatory reason for the action. *Adamson* 514 F.3d at 1146. Once defendant does so, summary judgment must enter unless plaintiff comes forward with evidence that defendant's reasons for the action are pretextual. *Id.* Pretext may be established by showing the employer's explanation is unworthy of credence or that an illegitimate bias, in fact, was the more likely motive behind the action. *Id.*

For summary judgment purposes, Deep Rock does not challenge Oberhamer's *prima facie* age discrimination case. Rather, Deep Rock contends it has articulated a legitimate, non-discriminatory reason for terminating Oberhamer, namely, that "Deep Rock ran out of money for the second time in the same year," and could not justify paying Oberhamer "when he was adding no economic value to the company." Oberhamer challenges Deep Rock's proffered reasons as pretextual.

As rebuttal sufficient to raise the inference of pretext, Oberhamer cites Lohn's statement that Oberhamer's job was better performed by "younger people" and their discussions regarding a move to a paid consulting position. Viewed in a light most favorable to Oberhamer, the willingness to employ Oberhamer as a paid consultant belies Deep Rock's preferred assertion that Oberhamer added "no value" to the company. While the evidence suggests economics, rather than age discrimination, was the principal motivation behind Deep Rock's actions, the offer of a different job, together with the comments about his age, dissuade me from taking this

11

claim from a jury. *See Plotke v. White,* 405 F.3d 1092, 1103 (10th Cir. 2005) ("So long as the plaintiff has presented evidence of pretext upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury."); *see also Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996) (remarks may serve as sufficient evidence of age discrimination if the offered comments are age related, proximate in time to the termination, made by an individual with authority over the employment decision at issue, and related to the employment decision at issue).

Deep Rock's Motion for Summary Judgment on Oberhamer's ADEA claim is DENIED.

**3.      Breach of Contract**.

Defendants move for summary judgment on Oberhamer's claim that the refusal to honor the Agreement's severance provision constituted a breach of contract.

To prove a breach of contract, plaintiff bears the burden of establishing (1) defendant entered into an agreement with him; (2) plaintiff performed, or substantially performed, his obligations under the agreement; (3) defendant failed to perform its obligations under the agreement, and; (4) resulting damages. *F.D.I.C. v. First Interstate Bank of Denver, N.A.*, 937 F. Supp. 1461, 1476 (D. Colo. 1996).

Oberhamer alleges Deep Rock breached the severance provision (¶ 2 of the Agreement) by unreasonably determining Oberhamer's termination was for "cause." Deep Rock offers two rebuttal arguments: (1) Oberhamer failed to perform his obligations under the Agreement thereby invalidating the agreement before the alleged breach, and; (2) Deep Rock denied Oberhamer severance pay in accordance with the Employment Agreement; therefore, no breach occurred.

### A.  Substantial Performance

First, Deep Rock asserts that Oberhamer invalidated the Agreement by failing to perform, or substantially to perform, his obligations.  Deep Rock asserts Oberhamer failed to perform his obligations because he was not adding "economic value" to the company.  Oberhamer asserts both an excuse for non-performance – he was never given a description of his job duties – and actual performance, evidenced by the fact that Deep Rock wanted to employ him as a consultant.

Clearly, an issue of fact exists.  Viewing the evidence in the light most favorable to Oberhamer, reasonable jurors could agree Oberhamer performed his obligations under the Employment Agreement.

### B.  Determination of Cause

Next, Deep Rock denies it breached the severance term of the Agreement because an employer's general discretion to evaluate and terminate an at-will employee necessarily includes the discretion "reasonably [to] determine" cause.   Mot. Summ. J. at 15.  "Where an employer has discretion to determine whether an employee's performance is satisfactory," Deep Rock reasons, "the employer is within its rights to discharge the employee."  *Id.* (citing *Bush v. Koll*, 29 P. 919, 920 (Colo. App. 1892) (employer properly terminated employment agreement where it determined the plaintiff did not perform satisfactorily); *Simpson v. Western Graphics Corp.*, 643 P.2d 1276, 1279 (Ore. 1982) (unless specifically contracted away, employer has discretion in determining whether cause exists for termination)).  The discretion to terminate, then, implies the discretion to determine cause and leaves the employee without a cause of action for breach. *Id.* citing *Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 922 (Ind. App. 2002) (summary judgment appropriate where employer had the discretion to determine whether cause existed to

discharge employee)).

Oberhamer agrees the applicable standard is "reasonably determines" under ¶ 2(a)(9), but disagrees that standard is subsumed by the discretion to terminate an at-will employee. Given the nature of the contract at issue, I agree with Oberhamer. Deep Rock agreed in the contract to limit its discretion with respect to the determination of "Cause" to a standard of reasonableness. That standard is distinct in logic and in fact from the standard Deep Rock enjoyed vis á vis Oberhamer's at-will status.

Deep Rock is correct that an employer has discretion to determine cause, as defined by common law, for terminating at-will employees. The question here, however, is whether the discretion to determine "Cause" is unfettered under the contract. Given Deep Rock's invocation of Agreement ¶ 2(a)(9) as grounds for "Cause," I conclude it is not.

A motion for summary judgment is an appropriate context within which to interpret a contract as a matter of law. *Roberts v. Am. Family Mut. Ins. Co.*, 144 P.3d 546, 548 (Colo. 2006). In reviewing a contract, the court's primary objective is to effectuate the intent of the parties according to the plain language and meaning of the contract. *Albright v. McDermond*, 14 P.3d 318, 322 (Colo. 2000). To determine the meaning of a contract, courts are guided by the general rules of contract construction. *Roberts v. Adams*, 47 P.3d 690, 694 (Colo. App. 2001). The court "also evaluate[s] the agreement as a whole and construe[s] the language in harmony with the plain and generally accepted meaning of the words employed, unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended." *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003).

The intent of the parties is revealed by reviewing the Noncompete/Employment

Agreement as a whole.  The recognition that Oberhamer was an at-will employee subject to

termination for "any reason or no reason at all" is set forth in the Noncompete/Trade Secrets

(Employment)  Agreement's Recitals.  *See* Agreement pp. 1-2 ("Company...may terminate

Oberhamer's employment at any time, with or without cause, with or without notice, for any

reason or for no reason at all").   The severance provision, by contrast, is a specific term of the

Agreement which promised Oberhamer one year's salary as severance if terminated "without

cause," but nothing if he left voluntarily or if his termination was "for cause."  Agreement ¶ 2,

Defs.' Ex. E (Doc. 61-6) at 4.  Paragraph 2 proceeds to identify eight specific examples of

conduct the parties agreed would establish "Cause," plus one catch-all example for conduct Deep

Rock "reasonably determines" constitutes "Cause."[3]  It is that catch-all provision, ¶ 2(a)(9), that

forms the basis for Deep Rock's "Cause" determination in this case.  Accordingly, to deny

Oberhamer severance using ¶ 2(a)(9) as grounds, Deep Rock's discretion was constrained to a

standard of reasonableness.

Oberhamer contends Deep Rock's "Cause" determination was unreasonable based on

evidence that includes the following:  Deep Rock never told Oberhamer what kind of 'value' it

wanted him to achieve; Oberhamer was terminated before having a reasonable chance to

perform; and Deep Rock offered Oberhamer a consulting job though Deep Rock now claims

---

[3]  As excerpted *infra* at pp. 2-3, Paragraph 2 of the Agreement sets forth Oberhamer's acknowledgment "that he is not entitled to any severance upon termination of employment if said termination is  . . . [voluntary]  . . . or if the Company terminates Oberhamer's employment for cause."  Defs.' Ex. E, (Doc. 61-6) at 4.  Subparagraph (a) proceeds to identify nine "[e]xamples of Cause":  Grounds (1)-(8) define "Cause" to include misconduct/malfeasance; insubordination; failure to provide effort beneficial to Company; conviction of a felony; guilty plea; conflict of interest; injurious conduct; and material breach of the agreement; Ground (9) is a catch-all provision, capturing any "other grounds that [the] Company reasonably determines constitutes [sic] Cause based on a consideration of its Business interests." *Id.* at 5.

Oberhamer added no value.  See Pl.'s Resp. to Mot. for Summ. J.  This evidence is sufficient to preclude entry of summary judgment.

**4.      Willful and Wanton Breach of Contract**.

Defendants' Motion for Summary Judgment on Oberhamer's claim for willful and wanton breach of contract based on C.R.S. § 13-21-102.5 is GRANTED.

Deep Rock relies on C.R.S. § 13-21-102.5 as a bar to non-economic damages in this case, specifically including Oberhamer's claim for exemplary damages.  C.R.S. § 13-21-102.5 states, "[i]n any claim for breach of contract, damages for noneconomic loss or injury or for derivative noneconomic loss or injury are recoverable only if ... [t]he recovery for such damages is specifically authorized in the contract that is the subject of the claim."  It is undisputed in this case that the Agreement provides no such authorization.

Oberhamer contends C.R.S. § 13-21-102.5 is inapplicable because Colorado courts have yet to apply it in any published decision and therefore there is no precedent for its application. The logic behind Oberhamer's contention is decidedly circular, and unpersuasive.  If new statutes are inapplicable absent existing precedent for their use in a particular context, how would that precedent ever be made?

The statute applies, its language is clear and it bars the type of claim made here. *Shepherd v. U.S.O.C.* 94 F. Supp.2d 1136 at 1148 (D. Colo. 2000) (Kane, J.) ("[e]xemplary damages are only available in Colorado pursuant to statute")(citing *Mortgage Finance, Inc. v. Podleski*, 742 P.2d 900, 902 (Colo. 1987).

**5.      Breach of the Covenant of Good Faith and Fair Dealing.**

Oberhamer contends Deep Rock breached the covenant of good faith and fair dealing

implied in every Colorado contract by making the "Cause" determination under ¶ 2(a)(9) of the

Agreement in bad faith.  Deep Rock moves for summary judgment, arguing employment

contracts are exempt from the implication of a covenant of  good faith and fair dealing under

Colorado law and that there is therefore no basis for the claim.

Oberhamer cites *McCartney v. Badovinac*, 160 P. 190, 191 (Colo. 1916), which requires

the implied covenant of good faith and fair dealing to be extended to all contracts where one

party has discretionary authority.  *See id.* ("in such contracts where a party simply says he is not

satisfied and stands upon that without more, we must not overlook the element of 'good faith' in

such expressed dissatisfaction").  Because his entitlement to severance turned on Deep Rock's

discretionary characterization of his termination having been for cause or without cause,

Oberhamer concludes the covenant of good faith and fair dealing applies and required Deep

Rock to exercise that discretion in good faith.  *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498

(Colo. 1996) ("the duty of good faith and fair dealing applies when one party has discretionary

authority to determine certain terms of the contract").  I agree.

Deep Rock distinguishes *McCartney* and *Amoco Oil* because neither involved an

employment contract and cites *Farmer v. Central Bancorporation, Inc.*, 761 P.2d 220 (Colo. Ct.

App. 1988) and *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379 (Colo. App. 1986) for the

proposition that the implied covenant of good faith and fair dealing does not extend to

employment contracts.  Oberhamer concedes the general rule that covenants of good faith and

fair dealing are not implied in contracts for employment in Colorado, but argues, again, that the

contract at issue is more than an "employment" contract and that the discretion to determine

cause for purposes of severance is distinct from the discretion, generally, to terminate

Oberhamer's employment.  Under the circumstances of this case, I agree.

As  previously set forth, the Agreement's Recitals recognized Oberhamer's at-will employment status and stated his employment was subject to termination, with or without cause, at Deep Rock's discretion.  The severance provision, however, operated separately to exempt Deep Rock from any obligation to pay severance if it "reasonably determined" Oberhamer's termination was for cause.  The severance provision bound Deep Rock to a standard of reasonable discretion separate and distinct from its discretionary authority as an at-will employer.  This difference cleaves the severance provision from any employment "contract," and permits, pursuant to the plain language of the reasonableness requirement, the implication of a covenant of good faith and fair dealing.

Viewed differently, *not* applying a good faith requirement would render Deep Rock's contractual obligations vis á vis severance pay illusory.  If Deep rock were not required to determine cause in good faith, then it would effectively receive a benefit (being able to avoid severance payments) in exchange for nothing.  This holding would render the Employment Agreement unfair and contrary to the parties' intent of mutual benefit.

Indeed, one may question whether a reasonableness requirement could exist without a concomitant obligation to act in good faith.  It would be irrational to say Deep Rock must be reasonable in its determination of cause, but need not necessarily act in good faith.  One envisions jurors considering whether Deep Rock, in fabricating reasons for terminating Oberhamer for "cause," nevertheless acted "reasonably."  I decline in this case to entertain the possibility.

An implicit covenant of good faith and fair dealing is found in any obligation to act

"reasonably."  The Miriam-Webster Online Dictionary defines reasonable, the root of

reasonably, as:

> 1 a: being in accordance with reason <a *reasonable* theory> b: not extreme or
> excessive <*reasonable* request> c: MODERATE, FAIR <a *reasonable* chance> d:
> INEXPENSIVE
> 2 a: having the faculty of reason b: possessing sound judgment <a *reasonable*
> man>

As illustrated above, "reasonably" is susceptible to several interpretations rendering the

term ambiguous.  Indeed, reasonable is one of the most vague, yet pervasive of legal terms.

Whether an ambiguity exists in a contract is a matter of law.  *Pepcol Manufacturing Co. v.*

*Denver Union Corp.*, 687 P.2d 1310 (Colo. 1984).  Once it has been established that an

ambiguity exists, the meaning of the contract's terms becomes a question of fact as evidenced by

the intent of the parties.  *Union Rural Electric Ass'n v. Public Utilities Commission*, 661 P.2d

247 (Colo. 1983).  "Reasonably" can be interpreted as meaning "in good faith" based on the

above definition of reasonable as "fair" and the context of the Noncompete Agreement in which

the term is used.  This interpretation governs the contract.

Oberhamer's alternative breach of contract theory that Deep Rock's failure to pay him

severance constituted a breach of the implied covenant of good faith and fair dealing survives

summary judgment.

**6.      Promissory Estoppel.**

After the give and take of discovery and the briefing on summary judgment, Oberhamer's

promissory estoppel claim focuses on his $200,000 investment in Deep Rock and the resulting

loss of virtually all of it when Deep Rock exercised its option under the Investor Rights

Agreement to repurchase it on Oberhamer's termination.[4]  Oberhamer claims that despite the options Deep Rock had under the Investor's Rights Agreement, Deep Rock Board of Managers members promised him Deep Rock would not exercise those options and that his investment would be "long-term." Resp. Mot. Summ. J. at 23.

The pleading and briefing on Oberhamer's promissory estoppel estoppel claim leaves much to be desired from a judicial standpoint.  Oberhamer's claim is phrased in the vaguest of terms, asserting he suffered unspecified "damages and losses" as a result of his reliance on the promise that his was to be a "long-term" investment and seeking only the "enforcement" of that promise to "prevent manifest injustice."  Compl. ¶ 70-71.  Obviously, because Oberhamer's stock has already been repurchased the enforcement of the promise to allow him to keep it "long term" is not amenable to specific enforcement, at least not without ordering those shares returned.  While he does not specifically request such equitable relief, I note it is at least theoretically available to him under Colorado's view that claims for promissory estoppel sound both in contract and in equity, depending on the nature of the claim.

The doctrine of "promissory estoppel," as articulated in section 90 of the Restatement of Contracts is part of the common law of Colorado.  *Kiely v. St. Germain*, 670 P.2d 764, 767

---

[4]    I note Oberhamer also invokes "promissory estoppel" to enforce Deep Rock's alleged promises for additional stock options and participation in an anticipated executive bonus plan, but his allegations fail on several grounds to support viable claims for relief.  The promises alleged are vague and conditional (participation in a bonus plan, for example, was contingent on one being implemented, and Oberhamer concedes none ever was); evidence supporting claims of reliance, reasonable or otherwise, is lacking; and the promise regarding opportunities to purchase additional stock (odd, given that the stock Oberhamer had was ultimately almost valueless) is contradicted by Oberhamer's own admissions in his deposition that no such promises were made.  Given that the remedy requested – specific performance – would be impossible to effect even under every positive view of the facts, the record simply supports no claim for relief under the Restatement as recognized by the Colorado courts.

(Colo.1983)(citing *Vigoda v. Denver Urban Renewal Authority*, 646 P.2d 900 (Colo.1982)).

That section, entitled "Promise Reasonably Inducing Definite and Substantial Action," originally

stated as follows:

> A promise which the promisor should reasonably expect to induce action or
> forbearance of a definite and substantial character on the part of the promisee and
> which does induce such action or forbearance is binding if injustice can be
> avoided only by enforcement of the promise.

The doctrine has since been restated in section 90(1) of the Restatement (Second) of Contracts,

as follows:

> A promise which the promisor should reasonably expect to induce action or
> forbearance on the part of the promisee or a third person and which does induce
> such action or forbearance is binding if injustice can be avoided only by
> enforcement of the promise. *The remedy granted for breach may be limited as
> justice requires.*

(Emphasis mine.)

As the Colorado Supreme Court explained in *Kiely*, this revised statement recognizes the force

of the principle that in some circumstances the interests of justice will best be served by partial

rather than total enforcement of the promise. *Kiely* at 767 ("we agree that any remedial order in

cases involving claims based on promissory estoppel must be fashioned carefully to achieve

fairness to all parties in the circumstances of the particular case")(citing Fuller & Perdue, The

Reliance Interest in Contract Damages: 1, 46 Yale L.J. 52 (1936)).  Accordingly, Oberhamer

would not be limited in his remedy on a viable claim for promissory estoppel to a request for

specific performance.  Were there sufficient facts in the record to support the elements of a claim

for promissory estoppel, Oberhamer would be entitled to seek disgorgement or restitution or

another form of equitable relief under § 90(1) of the Restatement (Second) of Contracts.

Unfortunately for Oberhamer, the record does not support a claim.

To prevail on a claim for promissory estoppel, a plaintiff must show: (1) defendant made a promise to plaintiff; (2) defendant should have reasonably expected that the promise would induce action or forbearance by plaintiff; (3) plaintiff reasonably relied on the promise to his detriment; and (4) the promise must be enforced to prevent injustice. *Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 151 (Colo. 2006). The promise alleged – that Deep Rock's Board of Managers promised him in connection with his 2004 investment that "whatever options" it might have had under the Investor's Rights Agreement, "it would not exercise those options and Oberhamer's investment would be 'long term'" (Resp. Mot. Summ. J. at 23) – is not born out by the record. The only promise that is supported in the record is that attributed to Lohn in the context of the ill-fated negotiations over the change to a consulting arrangement in early 2006. This, of course, was more than a year after Oberhamer invested his $200,000, and could not have been a promise on which Oberhamer relied in making the investment.

Oberhamer asserts in his Response that the promise that his investment would be long-term "was made by Deep Rock's board of managers, including Dirk Tyler, Abbott Lawrence, Bob Manning, and John Thomson.'" Resp. at 23 (citing Oberhamer Dep. at 67:14-21). A review of the record cited does not reflect the actual testimony and omits material testimony that makes the assertion inaccurate. The actual testimony from Oberhamer's deposition is recorded as follows:

> A:   With regard to my investment, it was my understanding that it was a mutual long-term agreement that would go until the liquidity event.

> Q:   And who told you that?

> A:   Well, it would have been members of the board of managers. The possibilities include, and it may have been all of them, Dirk Tyler, Abbott Lawrence, Bob Manner, and John Thomson.

Oberhamer Dep. 67:14-21.  The rest of the inquiry, not referenced by Oberhamer, reveals not

only how vague the alleged "promise" was, but also that it had nothing to do with Deep Rock's

intentions regarding exercising its option to repurchase Oberhamer's shares in the event of a

termination.

> Q:      You said that it's possibilities and it may have been all of them.  Do you
>         remember any of those individuals specifically telling you that it would be
>         a mutual long-term agreement that will go to a liquidity event?
>
> A:      I think I – at the time of actually executing the investment, I spoke more
>         with Abbott Lawrence than with anyone else about that, and my
>         recollection is that he made sure I understood that this was money that I
>         wasn't going to get back until there was a liquidity event, and that we
>         didn't know when that was going to be, so be sure, you know, you don't
>         need it next year or something like that.
>
> Q:      Do you specifically remember Mr. Lawrence saying that to you?
>
> A:      I can't attribute it to him specifically, but I do recall specifically that
>         someone emphasized that to me.
>
> Q:      Can you specifically attribute it to anyone?
>
> A:      No.

*Id.*, 67:22-68:17.  I agree with Deep Rock that this testimony supports no inference of the

promise alleged.  Considered in the light most favorable to Oberhamer, the conversations evince

an expectation that Oberhamer would hold his stock at least until "next year," 2005, which he

did.  This is not a promise to let Oberhamer hold his stock beyond any termination or

irrespective of Deep Rock's rights under the Investor Rights Agreement.

Further, there are no facts in the record supporting an inference that Oberhamer

reasonably relied on such a "promise."  In his affidavit, Oberhamer says he agreed to invest the

$200,000 in 2004 because he "believed" he was "required" to do so "to retain [his]

employment." Affid. at ¶¶ 9-10.  And while his negotiations with Lohn (and the email from

Oakley) may support an inference that Deep Rock would forego repurchasing Oberhamer's stock

and instead let him hold it "long term," those negotiations took place in early 2006.  Because

these took place a year and a half *after* Oberhamer agreed to invest his $200,000, they could not

have been the source of Oberhamer's 2004 investment decision.

In short, and while Deep Rock's actions in exercising its option to repurchase

Oberhamer's stock when it did may rankle, and, I note, support an inference of bad faith or

unfair dealing in equity or under the Investor's Rights Agreement (which was intended, I note, to

protect Oberhamer!), they do not support a claim, or remedy, for promissory estoppel.

### 7.    Negligent Misrepresentation.

Next Defendants move for summary judgment on Oberhamer's claim of negligent

misrepresentation, which is premised on allegations that have changed significantly during the

course of this litigation.[5]   In essence Oberhamer claims Deep Rock "negligently" misrepresented

his entitlement to executive bonus and stock purchase plans, and "negligently" misrepresented or

implied that he would be able to hold on to his stock long term.  Oberhamer's allegations, as now

conformed to the evidence, give rise to no actionable claim for negligent misrepresentation under

---

[5]  I note Oberhamer's allegations in support of his negligent misrepresentation claim have changed during the course of discovery from prediscovery allegations that theoretically could support a claim to record-based facts that cannot.  In his Complaint, Oberhamer asserted Deep Rock misrepresented its financial status to induce Oberhamer to purchase Deep Rock stock.  I must assume Oberhamer abandons this claim because it does not appear in any of his later statements of claim and is not addressed in his Response to Defendants' Motion for Summary Judgment.  *See Goodwin v. General Motors Corp.*, 275 F. 3d 1005, 1007 n.1 (10th Cir. 2002), *cert. denied*, 537 U.S. 941 (2002).  After discovery was obtained, Oberhamer's allegations changed to conform to the gathered evidence of Deep Rock's statements about Oberhamer's ability to hold his stock "long term" and a potential stock option and bonus plan.

Colorado law.

To succeed on a negligent misrepresentation claim, plaintiff must prove: (1) a false statement by defendant to plaintiff that was (2) made in the course of defendant's business and (3) made for use by plaintiff in a business transaction; (4) that defendant was negligent in communicating the false information to plaintiff; (5) defendant knew or intended that plaintiff would use the false information in a business transaction; (6) plaintiff relied on the information, and (7) plaintiff's reliance caused him damage. *First Nat'l Bank v. Collins*, 616 P.2d 154, 155-156 (Colo. App. 1980); *see generally* Colorado Jury Instructions for Civil Trials, 4th edition, 9:4.

The same promises that underlie Oberhamer's promissory estoppel claim also underlie his claim for negligent misrepresentation.  Oberhamer contends Deep Rock committed to letting him hold his stock long-term and that he would receive stock options and be eligible to participate in an executive bonus plan.  Oberhamer contends these statements constitute false information, negligently communicated, on which he relied to his detriment.  The representations simply fall outside the negligent misrepresentation rubric.

A.      **The representations cannot be "false" or "negligently communicated."**

As an initial matter, the representations at issue could not have been both "false" and "negligently communicated."  Any representation in 2004 or 2005 that Oberhamer could hold his stock long term or participate in bonus or stock purchase programs was either sincere, or "true," when made or insincere.  They are not objective factual representations and their relative truth or falsity turn solely on the maker's intent.  If they were sincere, when made, they could not constitute "false" information and even "negligence" on the part of Deep Rock in its belief that it could deliver on those representations would support a claim for negligent *mis*representation.  If

they were insincere or "false" when made, then Deep Rock knew at the time it was making the representation that would not have to deliver on them and would have acted intentionally or fraudulently in inducing any reliance on the part of Oberhamer, not "negligently."

Oberhamer's negligent misrepresentation claim, as a matter of fact, is an attempt to apply standards of negligence to recover for fraud without proving fraud.

**B.     Even if the Facts Supported a Theory of Negligent Misrepresentation, the Claim would not Survive Summary Judgment.**

Deep Rock asserts essentially two defenses to Oberhamer's negligent misrepresentation claim: (1) Oberhamer failed to prove he relied on these promises in a transaction with a third party as required by law, and; (2) Oberhamer could not have reasonably relied on these promises because they were either contradicted by contract or too vague.

Deep Rock relies on decisions by this Court for its contention that Oberhamer must use the information Deep Rock conveyed in a transaction with a third party to succeed with a negligent misrepresentation claim.  See *van Heerden v. Total Petroleum, Inc.*, 942 F. Supp. 468, 474 (D. Colo. 1996) ("[a] necessary element . . . is that the defendant gave information to the plaintiff for use in a business transaction with a third party"); *Snoey v. Advanced Forming Technology, Inc.*, 844 F. Supp. 1394, 1400 (D. Colo. 1994) (dismissing negligent misrepresentation claim because plaintiff only alleged claim against defendants and not a third party) (citing *Colorado National Bank,* 757 F.Supp. at 1167).  The argument is academic in this case, where Oberhamer does not even attempt to bring his allegations within the framework of a negligent misrepresentation claim as that claim is typically understood.  Instead, he cites cases in which negligent misrepresentation claims were brought against parties to a contract, but which otherwise have little in common with his claims here.  *See Keller v. A.O. Smith Harvestore*

26

*Products, Inc.*, 819 P.2d 69 (Colo. 1991); *First Nat'l Bank in Lamar v. Collins*, 161 P.2d 154,

155-156 (Colo. App. 1980) C.J.I. Civ. 4th 9:4, at Annotation no. 14 ("a claim for negligent

misrepresentation can be based on false information that the defendant gave the plaintiff for use

in a business transaction between the plaintiff and the defendant").  Because there is no business

or commercial "transaction" at issue, the third party requirement is inapposite.

Deep Rock is correct that Oberhamer's negligent misrepresentation claim fails, but its

reliance on the third-party requirement misunderstands the controlling law.  The "economic loss"

doctrine announced in *Town of Alma v. Azco Constr. Co.*, 10 P.3d 1256 (Colo. 2000) controls

here, where the duties Oberhamer claims Deep Rock breach arose solely and exclusively in

contract and are thus controlled solely and exclusively by contract law.  The economic loss

doctrine is not inconsistent with my decisions in *van Heerden* and *Snoey*.

Under the economic loss doctrine, a party suffering only an economic loss from the

breach of a contractual duty may assert a tort claim for breach only if tort law provides an

independent duty of care.  *Town of Alma* at 1266.  Here, no duty of care independent of the

parties' contractual obligations exists; the duties Oberhamer claims Deep Rock breached sound

solely and exclusively in contract.  As a result, no action in tort will sound.

Deep Rock's second argument is that any reliance on Deep Rock's "misrepresentations"

was either contravened by express terms of the parties' contracts or belied by Oberhamer's own

admissions.  For example, Oberhamer states it was "his understanding" that statements Deep

Rock made about a "liquidity event" were promises or "representations" that he could retain his

stock long-term.[6]  Pl.s' Exhibit 4, Oberhamer Dep. 67:14-16.  Deep Rock contends these

---

[6]      Again, these are not *mis*representations and were either true (and mistaken or
negligent) or false (and fraudulent) when made.  A promise that exists only by virtue of a

statements were cautions to Oberhamer that he would be unable to liquidate until a "liquidity event" rather than promises of long-term forbearance on Deep Rock's part related to its repurchase option. As previously stated, Oberhamer's deposition supports Deep Rock's contention. Def. Mot., Ex. A, 68:5-7, ("...my recollection is that he made sure I understood that this was money that I wasn't going to get back until there was a liquidity event..."). Additionally, the Investor Right's Agreement Oberhamer signed directly contradicted Oberhamer's "understanding." Defs.' Ex. L, Investor Rights Agreement ¶2A.2(a). This should have clarified Deep Rock's statements or at least alerted Oberhamer to his mistake. Nonetheless, Oberhamer contends he was misled. Even considering the evidence in a light most favorable to him, Oberhamer proves only his own mistaken "understanding." Oberhamer's misunderstanding of Deep Rock's statements does not a tort make.

Oberhamer also contends Deep Rock made false statements that Oberhamer would receive a bonus and stock options. Oberhamer offers as proof an email from Deep Rock stating: "You will be eligible to participate in the Company's performance bonus and stock option plans which we will design after the contemplated acquisition takes place." Defs.' Mot. Ex. C, Oberhamer Email. Oberhamer again proves only his unjustified misunderstanding. According to the email, Deep Rock is not promising a bonus or stock options, only eligibility to participate in a future plan. Oberhamer contends he relied on these speculative statements as guarantees of a bonus and stock options. Oberhamer's reliance is unjustified. Williston on Contract §69:33 (4th ed.). Deep Rock had discretion in the design of future plans and their distributions. Furthermore, even if Oberhamer can prove the falsity of these statements, they would support

---

contract that was negligently made may give rise to a claim sounding in contract, but it will not, without more, give rise to a claim sounding in tort.

fraud or bad faith claims, not negligent misrepresentation claims.

Oberhamer's claim for negligent misrepresentation fails as a matter of law under both Rule 12(c) and 56(c), and Defendants' are entitled to summary judgment for these additional reasons as well.

**8.    Outrageous Conduct.**

Oberhamer's outrageous conduct claim fails on its face and I address it only briefly.

To constitute outrageous conduct under Colorado law, a defendant's actions must be "[s]o outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988), *superseded on other grounds by* C.R.S. § 13-25-125.5.  Whether defendant's conduct is sufficiently outrageous to satisfy this standard is properly determined in the first instance by the court.  *Coors Brewing Company v. Floyd*, 978 P.2d 663 (Colo. 1999).  Managers' and boards of director conduct in the context of a business performance dispute between a company and an executive employee are generally not the stuff of outrageousness, and this case is no exception.

Oberhamer alleges Deep Rock's conduct rises to the level of outrageous conduct because Deep Rock "willfully and maliciously" disregarded its contractual obligations, decided Oberhamer was too expensive and that younger employees could do his job functions better, and coerced him into giving up his rights to severance and stock and bonus options during the road to termination.  Oberhamer also suggests that Deep Rock terminated him when he requested to speak with an attorney, forced him to sell his $200,000 investment back for $9,000, and lured him to leave Colorado and take a job in Arizona.  Oberhamer alleges Deep Rock's actions were calculated to cause Oberhamer severe emotional distress.

29

It is difficult to infer from these allegations that Deep Rock's actions went "beyond all possible bounds of decency." *Churchey*, 759 P.2d at 1350. Some of Deep Rock's actions do not even go beyond the bounds of its contracts. Deep Rock was within its rights under its agreement with Oberhamer to repurchase Oberhamer's stock, even at the tremendous loss Oberhamer suffered. Deep Rock was within its rights under the contract to enforce Oberhamer's covenant not to compete. Defs.' Ex. E, Employment Agreement ¶ 1. Oberhamer was free to stay and work in Colorado as long as he complied with the covenant not to compete. Oberhamer decided to move to Arizona so he could remain in the bottled water industry.

Even viewed cumulatively, Deep Rock's course of conduct does not evince the necessary level of invidious intent. There was give and take and a process of negotiation; acting with a purpose to harm cannot be inferred from conduct that included offering Oberhamer a demotion in lieu of termination, then negotiating a consulting arrangement, and ultimately offering Oberhamer eighteen weeks of severance.

In sum, no rational juror could conclude that Deep Rock's conduct rose to the level of outrageousness necessary to infer intentional infliction of emotional distress. Deep Rock is entitled to summary judgment on this claim as well.

### **Summary of Orders.**

Defendants' Motion for Summary Judgment (Doc. 61) is GRANTED in part and DENIED in part as follows:

1.     Defendants' objection to evidence pursuant to Rule 408, F.R.E., is OVERRULED.

2.     Defendants' Motion for Summary Judgment on Plaintiff's claim of age discrimination is DENIED.

3.     Defendants' Motion for Summary Judgment on Plaintiff's breach of contract claim is

DENIED.

4.      Defendants' Motion for Summary Judgment on Plaintiff's claim for willful and wanton

breach of contract is GRANTED.

5.      Defendants' Motion for Summary Judgment on Plaintiff's claim for breach of good faith

and fair dealing is DENIED.

6.      Defendant's Motion for Summary Judgment on Plaintiff's claim of promissory estoppel

is GRANTED.

7.      Defendants' Motion for Summary Judgment on Plaintiff's claim of negligent

misrepresentation is GRANTED.

8.      Defendants' motion for summary judgment on Plaintiff's claim of outrageous conduct is

GRANTED.

This case will be set for Pretrial Conference by separate Minute Order.  If, in the interim,

the parties are amenable to a referral for settlement, either side or both may contact chambers to

request one.  It is my view based on the record before me that both sides bear substantial risks in

proceeding to trial.


Dated: April 29, 2009.                          **John L. Kane**
                                                SENIOR U.S. DISTRICT JUDGE